UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YOUSRY "GEORGE" SALAMA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civ. Action No. 4:12-cv-03535 |
| | § | |
| WESTERN WIND ENERGY CORP. | § | |
| and WESTERN SOLARGENICS, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

This case arises out of Plaintiff Yousry "George" Salama's work as a consultant for Defendants West Wind Energy Corp. and Western Solargenics, Inc. (together "Defendants" or "Western Wind") and his compensation for that work. After considering Defendants' Motion for Summary Judgment, all responses and replies, and the applicable law, the Court concludes that the Motion should be **GRANTED.**

## I.   BACKGROUND[1]

Salama entered into a consulting agreement with Defendant Western Wind Energy Corp. on Nov. 30, 2007. (Doc. No. 13-2 at 1.) The contract called for Salama to become the Vice President for Solar Initiatives for Western Wind Energy Corp. and President and Chief Executive Officer of its wholly owned subsidiary, Western Solargenics, Inc. (*Id.*) The agreement was to last two years. (*Id.*) In exchange for his services, Salama was to receive an annual "fee" of $180,000, paid in monthly installments, reimbursement for various job related expenses, and a grant of stock options. (*Id.* at 2.) Salama was to receive 275,000 shares of Western Wind's outstanding common stock "with a strike price equal to the cost of the stock as of November 30,

---

[1] The following facts in Section I are undisputed, except where noted.

2007, less the maximum discount allowable by the Toronto Stock Exchange." (*Id.*) Those options were to "vest over 24 months in 4 equal increments of 68,750 shares," with all shares having vested by Nov. 30, 2009. (*Id.*)

After that first two-year agreement lapsed, the parties entered into a new agreement (the "Second Consulting Agreement") on Dec. 1, 2009. (Doc. No. 13-3 at 1.) Under the Second Consulting Agreement, which was also to run for two years, Salama was to retain the same job titles. (*Id.*) He was to be paid an annual fee of $180,000 and receive the same reimbursement privileges as he was under the First Consulting Agreement, but under the Second Consulting Agreement, he would not be granted any additional stock options. (*Id.* at 2.) Among other things, the Second Consulting Agreement contained a detailed provision outlining the various ways in which Salama could be terminated and how he would be compensated, if at all, upon termination. (*Id.* at 3.)

Just over a year after executing the Second Consulting Agreement, Salama received a Notice of Termination. (Doc. No. 21-5 at 1.) That notice, which was not itself dated, but which the parties apparently agree was issued Dec. 30, 2010 (Doc. No. 1 ¶ 5.4; Doc. No. 8 ¶ 5.4), dictated that Salama would be relieved of his duties as of the next day, (Doc. No. 21-5 at 1.) It stated that Western Wind Energy Corp.'s Board of Directors "ha[d] conducted a careful review of the services" rendered by Plaintiff and "found that [Salama] did not provide the leadership and business development services the Company required." (*Id.*) It went on to explain that "the Consultant did not provide accurate and timely budgeting, accounting, reporting, and analysis in support of decision-making with the company." (*Id.*) The Notice informed Salama that it would be "willing to pay a termination benefit of US $90,000 once [Salama] ha[d] provided the Company with a full and satisfactory accounting of all the contacts, personal relationships,

representations and commitments [he] made while conducting business as Western Solargenics Inc. on behalf of the company and upon execution of a Separation Agreement." (*Id.*) The Second Consulting Agreement contained a provision — which, in the context of the agreement as a whole, appears to be the provision for termination without cause — under which Salama would be eligible for a $90,000 payment in the event of termination, though that provision also required three months' notice. (Doc. No. 13-3 at 3.)

Dissatisfied with the termination benefit offered to him, Salama requested three months of notice pay, as he believed he was entitled to under the Second Consulting Agreement. (Doc. No. 21-1 at 2.) Defendants refused (*id.*), and Salama filed a lawsuit — distinct from the instant lawsuit — here in United States District Court for the Southern District of Texas. (*See* Doc. No. 13-4.) Plaintiff alleged breach of contract, asserting that Western Wind had breached the Second Consulting Agreement, and unjust enrichment. (*See id.* at 5-6.) That suit was filed on May 13, 2011. (Doc. No. 21-1 at 2.)

After the complaint had been filed, the parties decided to mediate the case. (*Id.*) The parties did not reach a settlement during the course of mediation, but the mediator offered his own settlement proposal, which the parties accepted. (*Id.*) Among other things, the mediator's proposal called for Defendants to pay Plaintiff $170,000. (Doc. No. 21-7.)

The parties then memorialized the terms of their settlement (the "Settlement Agreement" or the "Agreement"), but that agreement was not signed right away. (Doc. No. 21-1 at 2.) The agreement called for Salama to receive Western Wind stock in an amount equal to $119,000 or, in the event that the Toronto Stock Exchange would not approve such transfer, $119,000 cash. (Doc. No. 21-8 at 1.) It also called for a payment of $51,000 to be made to Salama's attorney. (*Id.* at 2.) In exchange for those payments, Salama made a number of promises. He "expressly

3

waive[d], release[d] with prejudice, acquit[ted], and forever discharge[d] Western Wind, and its respective divisions . . . from any and all claims, demands, demands for arbitration, and causes of action which he has or claims to have, known, or unknown, of whatever nature, which exist as of, or prior to, the date of this Agreement." (*Id.*)  The agreement stated that "[a]s used in this paragraph, 'claims,' 'demands' and 'causes of action' include, but are not limited to, all claims for unpaid compensation, wages, or benefits," all claims arising under basically any employment-related law, and "any other claim arising out of Salama's provision of consulting services to any of the Western Wind released parties." (*Id.*)  The agreement also contained a clause which noted that it "is a FULL and COMPLETE Release and includes a release of all claims Salama has for all damages of any kind or character arising out of his provision of consulting services to any of the Western Wind Released Parties, and that by signing this Agreement, Salama is waiving any right to any amount of additional compensation." (*Id.*) Further, the agreement stated that "[t]he Parties intend this release to be as general as possible, covering every conceivable contingency which might arise in the future in connect with Salama's provision of consulting services to any of the Western Wind Parties or which may have arisen in the past, whether known or unknown." (*Id.* at 3.)  Finally, the agreement reiterated that it "constitutes an integrated written contract, expressing the entire agreement between the Parties with respect to the subject matter hereof.  The Parties further understand and agree that this Agreement can be amended or modified only by a written agreement, signed by all of the Parties hereto." (*Id.* at 4.)

Salama signed the agreement Oct. 5, 2011 and a representative of Western Wind signed it a week later.  (*Id.* at 5-6.)  On Oct. 27, however, Salama received an e-mail from Alana Steele, Chief Operating Officer and General Counsel of Western Wind Energy Corp., alerting him that

Defendants were having trouble issuing stock to Salama. (Doc. No. 21-9 at 2.) To be eligible to receive Western Wind shares, she said, he needed to be either an "accredited investor" under U.S. securities laws or to have an income greater than $200,000 for the past two years. (*Id.*) Salama informed her on Oct. 28, 2011 that he was neither of those things. (*Id.* at 1.) But, he proposed a compromise: he explained that he still had 275,000 stock options which he could exercise for $1.32 a share and that he "c[ould] use the $119,000 to buy 90,151 shares. In this case you can issue me a certificate for 90,151 shares." (*Id.*) Apparently satisfied with this proposal, Steele wrote Salama on Nov. 15, 2011 to say that he could "now exercise 90,151 options @ $1.32." (Doc. No. 21-10 at 1.) Steele explained that "Western Wind will write you a check for $119,000 immediately upon receiving the funds from the broker." (*Id.*) In short, Western Wind agreed to give $119,000 cash to Salama, with the understanding that he would use it to purchase shares of Western Wind stock. (Doc No. 21-1 at 3.)

That transaction had not taken place, though, by Nov. 28, 2011, when Salama's attorney reached out to Steele to see whether Salama would be receiving the Western Wind shares called for in the Settlement Agreement as written. (Doc. No. 22-2 at 3.) Steele explained the compromise Salama had proposed, noting that Salama "would be able to exercise 90,151 of his previously expired stock options (the company essentially reissued the options)" and that Salama "has been in touch with our Vancouver office through his Canadian broker, who has confirmed that he can now exercise his options." (*Id.* at 2-3) Steele suggested Salama's attorney "should talk to [his] client again." (*Id.* at 2.)

Salama himself replied to that message on Nov. 29, 2011. (*Id.* at 1.) He indicated that he was not aware that the proposal he had floated had been accepted. (*Id.*) He also asked to confirm that the process would go as follows:

1-  Western Wind send[s] me a wire transfer to my bank for US$119,000
2-  I turn around and send a wire transfer of $119,000 to Western Wind asking to exercise 90,151 share options
3-  Western Wind send[s] me a stock certificate with 90,151 shares

(*Id.*)  The record is not clear when the transaction was consummated, but the parties agree that it was, sometime after the Nov. 29 e-mail and before Dec. 30, 2011.  (*See id.*; Doc. No. 21-1 at 4.)

Salama notes that "[t]here is no document which states that the Settlement Agreement was amended to allow a different payment method to be made."  (Doc. No. 21-1 at 4.)  As Salama characterizes it, he "had to exercise previously vested stock options in order to obtain stock, and the only thing that Western Wind Energy Corp. did that was of benefit to [him] was to loan [him] $119,000 for a couple of hours for [him] to use to exercise [his] vested options."  (*Id.*) He attests that he "never stated verbally or in writing that the brief loan of $119,000 was in full satisfaction of all of Western Wind Energy Corp.'s obligations under the Settlement Agreement." (*Id.*)

On Dec. 30, 2011, Salama sought to exercise another 91,000 stock options.  (Doc. No. 21-11 at 3.)  A Western Wind representative, however, responded by e-mail that Salama's options had expired.  (*Id.*)  Salama, in turn, replied that his options were vested and "exercisable to December 2012 as per the Options Agreement."  (*Id.* at 2.)  He argued that "[i]t is not fair that when it suited WWE because it did not have the cash to pay the settlement, WWE reinstated 90,151 shares of my options while when now I have the means to exercise my options, WWE withhold (sic) exercising the balance of my options."  (*Id.*)  As such, he "ask[ed] WWE to reinstate the balance of [his] options 183,849 shares for at least a period of six months till June 30, 2012."  (*Id.*)

Western Wind denied that request.  In a Jan. 4, 2012 e-mail, Ms. Steele explained that "the Stock Option Plan, pursuant to which your Option Agreement was issued, clearly states that

consultants (if not terminated for cause) have a 'reasonable time' after they cease to be consultants/directors/etc. to exercise any options that have vested prior to cessation date.  Up until the recent Plan was approved, that time period had been 30 days.  The TSX generally considers a reasonable time as not exceeding one year.  We were able to extend only a portion of the options for the settlement of your case."  (*Id.* at 1.)  Steele closed by noting that "the Board is not inclined to exercise their discretion to extend the expiry date for the remaining options, and since you waived all claims against Western Wind with the settlement, there isn't much more I can do."  (*Id.*)  Steele sent along a copy of the aforementioned Stock Option Plan.  (*Id.*)  According to a copy of the Option Agreement between Plaintiff and Defendants that Plaintiff has provided to the Court, the options to purchase were to expire Dec. 10, 2012.  (Doc. 21-4 at 2.)  That Agreement does not contain provisions dictating what would happen in the event that Salama was terminated, but it does note that it is made "pursuant to the Company's Incentive Stock Option plan."  (*Id.*)

A Stock Option Plan, dated May 17, 2010, was affixed to the Complaint in this case.  (*See* Doc. No. 1-1 at 1.)  Article 9 of the Plan dictated that, in the event an employee was terminated, "the Options held by the Optionee will expire within a reasonable period following the Cessation Date . . . which period shall be determined by the Board.  The Optionee shall only be entitled to exercise Options which have vested at the Cessation Date."  (*Id.* at 7.)  The Plan further provided that "[i]f a Post Cessation Date Exercise Period is not set out in an option agreement, the Board shall determine the Post Cessation Date Exercise Period and Western Wind shall provide notice to the Optionee of the Post Cessation Date Exercise Period within five (5) business days of the Cessation Date."  (*Id.*)  An exception to the foregoing provision existed, however, for employees terminated for cause: the Plan held that "no Option held by such

Optionee may be exercised following the Cessation Date." (*Id.*)   Article 10 stated that "the Board may extend the period of time within which an Option held by an Optionee who has ceased to be an Eligible Optionee may be exercised, but such an extension shall not be granted beyond the original Expiry Date of the Option." (*Id.* at 8.)

Salama professes that he "had no intention at the time the Settlement Agreement was signed to waive any rights [he] had to the 275,000 vested stock options." (*Id.* at 5.)   As such, he filed this lawsuit on Dec. 5, 2012, alleging breach of contract and misrepresentation. (Doc. No. 1.)   Defendants moved for summary judgment on August 9, 2013. (Doc. No. 13.)

## II.   LEGAL STANDARD

To grant summary judgment, the Court must find that the pleadings and evidence show that no genuine issue of material fact exists, and therefore the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997).  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

Factual controversies should be resolved in favor of the nonmoving party.  *Liquid Air Corp.*, 37 F.3d at 1075.  However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Id.* at 1076 (internal quotations omitted).  Importantly, "[t]he nonmovant

cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Services, LLC*, 341 F. App'x 26, 28 (5th Cir. 2009) (citation omitted). The Court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075. As the Supreme Court has noted, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  ANALYSIS

Defendants move for summary judgment on the grounds that the Settlement Agreement, signed by the parties when they settled the first lawsuit between them, "should be interpreted by the Court, as a matter of law, to bar" Plaintiff's claims. (Doc. No. 13 at 11.) Plaintiff makes two primary arguments in response: the Settlement Agreement cannot be enforced because there was a failure of consideration and, second, even if the Settlement Agreement was valid, it was not so broad as to bar claims that, like Plaintiff's here, had not yet arisen when the Settlement Agreement was signed. (*See* Doc. No. 21 at 9-14.) Whether there was valid consideration to support the Settlement Agreement is a logically antecedent question, so the Court turns to it first, and finds no failure of consideration. The Court then addresses whether the Settlement Agreement bars the claim Plaintiff makes in this lawsuit and finds that it does. The Court must, therefore, grant defendant's motion for summary judgment.

### A. Failure of Consideration[2]

There can be no valid contract without consideration. *See Texas Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970). Even where the parties have agreed upon consideration, "[f]ailure of consideration . . . occurs when, due to a supervening cause after an agreement is reached, the promised performance fails." *City of The Colony v. N. Texas Mun. Water Dist.*, 272 S.W.3d 699, 733 (Tex. App.-Fort Worth 2008, pet. dism'd) (citing *U.S. Bank, N.A. v. Prestige Ford Garland Ltd. P'ship,* 170 S.W.3d 272, 279 (Tex.App.-Dallas 2005, no pet.)). "[F]ailure of consideration may result as a consequence of one party's failure to perform its obligations under the agreement, resulting in the other party's failure to receive the consideration set forth in the agreement." *Id.* (citing *U.S. Bank, N.A.*, 170 S.W.3d at 279). "A complete failure of consideration constitutes a defense to an action on a written agreement." *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 276 (Tex. App.-Dallas 2006, no pet.) (citing *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App.-Houston [14th Dist.] 2004, no pet.)). "The defense of failure of consideration defeats summary judgment if the nonmovant alleges facts and presents evidence that the consideration in the agreement was not received." *Id.* (citing *Suttles,* 152 S.W.3d at 614; *Stewart v. U.S. Leasing Corp.,* 702 S.W.2d 288, 290 (Tex.App.-Houston [1st Dist.] 1985, no writ)).

Plaintiff's failure of consideration argument proceeds like this: the settlement agreement called for Salama to receive Western Wind stock worth $119,000 or, in the event that approval for that grant could not be obtained from the Toronto Stock Exchange, $119,000 cash. (Doc. No.

---

[2] Western Wind argued at the November 15, 2013 hearing on this motion that the Court should not entertain Plaintiff's failure of consideration argument because Plaintiff did not make that argument in his pleadings. Plaintiff responded that he did not plead a failure of consideration because, from his point of view, this case is not governed by the Settlement Agreement. That is, Plaintiff argues that when he made out his Complaint, he was not seeking to enforce the Settlement Agreement. He contends that it was not until Defendants argued that the agreement barred Plaintiff's claims that the Agreement came into play, and thus whether a failure of consideration was pleaded should be of no important. The Court believes that Plaintiff has the better argument, but as set forth below, that finding does not alter the ultimate result.

21 at 12.)  But, because Western Wind encountered problems obtaining TSX approval and then finding the requisite cash, the ultimate "consideration" was an $119,000 cash advance made so that Salama could exercise 90,151 stock options that had been granted to him under the First Consulting Agreement.  (*Id.* at 12-13.)  The $119,000 Western Wind paid to Salama was a "loan" and the stock itself was "something to which he was already entitled."

That argument distorts the nature of stock options.  Typically speaking, and as the Stock Option Agreement and Plan in force in this case dictate, an employee who is granted stock options cannot, immediately upon the grant, do anything to monetize those options.  Eventually, though — sometimes all at once, sometimes in portions — the options vest.  When the options vest, the employee to whom they were granted has the option, but not the obligation, to purchase those shares.  Generally speaking, the employee has to use his or her own money to make that purchase.  Quite often, as was true for Salama, the purchase can be made at a price lower than what the shares would cost on the open market.  But still, the employee has to part with some of his own cash to obtain the shares.  The central premise of stock options is that the employer is not granting the employee *stock* — that would be an issuance of restricted stock — but rather the chance to purchase stock at an (hopefully) advantageous price.  For an extremely basic explanation of these concepts, see E*Trade, *Restricted Stock*, https://us.etrade.com/ctnt/investor-education-center/ArticlePage?aid=bfca096d-9004-46e5-96af-5dcdc9657955 (last visited Nov. 19, 2013), and E*Trade, *Employee Stock Options*, https://us.etrade.com/ctnt/investor-education-center/ArticlePage?aid=78e28a37-c6c4-42cb-a3a4-2f12dd89818e (last visited Nov. 19, 2013).

Here, however, Plaintiff did not have to pay any of his own money to exercise his options.  Western Wind gave him the $119,000 he needed to buy 90,151 shares.  Rather than having to spend his own $119,000 in order to purchase the shares, which he could then sell to

turn a profit, the company paid for the shares such that their full value was profit for Salama. Indeed, as Western Wind argues, Plaintiff received assets worth more than $119,000, because the open-market value of the shares exceeded the price at which he purchased them.[3]  Plaintiff's argument that the Western Wind stock was "something to which he was already entitled" simply ignores that he was not "entitled" to the stock at no cost.[4]

The Court believes that, in light of the foregoing, it need not address Western Wind's argument, which is that Salama's options, though vested, had expired, and therefore, he had absolutely no claim of entitlement to the stock he was allowed to purchase.  (Doc. No. 22 at 5.) This is a harder argument to resolve on the record before the Court.  It would be easy if Salama had been terminated for cause, because then the options would have expired immediately.  But if he was terminated without cause, the Stock Option Plan dictated that the options would "expire within a reasonable period following the Cessation date (the 'Post Cessation Date Exercise Period'), which period shall be determined by the Board."  (Doc. No. 1-1 at 7.)  All the Court has to go on to ascertain the length of the Post Cessation Date Exercise Period is Steele's Jan. 4, 2012 e-mail, which explained that "[u]p until the recent Plan was approved, that time period had been 30 days.  The TSX generally considers a reasonable time as not exceeding one year."  (Doc. No. 21-11 at 1.)  If the former period was in effect, then the options had clearly expired, given that Salama was terminated Dec. 30, 2010.  But if the longer period were in effect, Salama's Dec. 30, 2011 e-mail expressing a desire to exercise his options would have come on the final

---

[3] Western Wind has made this assertion without offering summary judgment evidence (Doc. No. 22 at 6), but Plaintiff has not contested it.  Moreover, a simple search of the Internet reveals that, whereas Salama's strike price was $1.32 per share, the open market price of the stock never fell below $1.77 per share between Nov. 29 and Dec. 30, the period during which Salama must have purchased his 90,151 shares.  *See* Western Wind Energy Corp., Yahoo Finance, *available at* http://tinyurl.com/qf5mg3d (last visited Nov. 19, 2013).

[4] It also bears mentioning that, even if the $119,000 did constitute a loan, a loan can be consideration to a contract. True, a loan would not be exactly what the Settlement Agreement called for Western Wind to provide Salama, but as explained in greater detail below, in light of the fact that Salama himself proposed the consideration he ultimately received, this is not fatal to the Settlement Agreement's validity.

day of the Post Cessation Date Exercise Period.[5]  In that case, the options would not have been expired when he sought to exercise then.  But because Steele's e-mail lends itself to multiple interpretations regarding the length of the Post Cessation Exercise Period, and because there is no other documentation in the record regarding the length of said period, whether the options had expired is a fact question that the Court cannot resolve on summary judgment.  But as explained above, that is not fatal to the Court's finding that there was no failure of consideration.

In the Court's view, the strongest argument that can be made in support of Salama's position is that the Settlement Agreement called for Western Wind to transfer company stock worth $119,000 to Salama, or in the event that the Toronto Stock Exchange did not approve that transfer, $119,000 in cash, and while Salama got something substantially similar to the two, the Agreement fails because Salama did not get one of the two forms of consideration expressly called for in the Agreement.  The thrust of that argument would be that the hybrid consideration Salama received — sort of a grant of stock, sort of a cash payment — was not as valuable as what was called for by the Agreement.  It was not as valuable as stock free-and-clear because it ate into the number of options he could otherwise exercise[6] and it was not as valuable as cash free-and-clear because it did not allow him to choose how to spend the cash — he was required to use it to purchase shares of Western Wind stock.

There are several problems with this argument, however.  First, it assumes that Salama independently had enough cash to exercise all of his options, and there is no evidence in the record one way or the other on that front.  Second, it would seem to assume that the Settlement

---

[5] Or perhaps the second-to-last day.  If provision 9.3(a)(i) of the Option Plan applied, then Salama ceased to be an "Eligible Optionee" "the last day on which the Eligible Optionee is to report to work for Western Wind," (Doc. No. 1-1 at 7), which apparently was Dec. 31, 2010.  (Doc. No. 21-5 at 1.)  The Post Cessation Exercise Period would thus run from Dec. 31, 2010, making Dec. 30, 2011 either the last or second-to-last day of a yearlong period, depending on how the company counted.

[6] In other words, had Western Wind granted him $119,000 worth of shares separate and apart from any options he had, he could have exercised all of his vested options *in addition* and therefore owned a greater number of shares at a great overall value.

Agreement entitled Salama, without qualification, to $119,000 worth of stock, but that was never the case, given that Salama's compensation in Western Wind stock was always contingent upon Western Wind obtaining approval from the Toronto Stock Exchange.  Third, it is factually wrong to the extent it relies on the premise that $119,000 cash, which could be used to purchase anything in the world, would be worth more than the stock he received.  That premise is incorrect because he could have immediately sold the shares he bought with Western Wind's $119,000 and turned a profit, and thus had even more cash to spend on whatever else he wanted. And fourth, and perhaps most fundamentally, it ignores that *Salama himself proposed payment by way of exercising options*.  Without any real prompting from Western Wind, it was Salama who said "[t]here may be another way" and proposed using "$119,000 to buy 90,151 shares." (Doc. No. 21-9 at 1.)  For one thing, that the ultimate form of compensation was his idea undercuts any argument that he placed greater subjective value on other forms of compensation. Moreover, his compromise agreement likely amounted to an accord and satisfaction.

"An accord and satisfaction exists when parties agree to discharge 'an existing obligation in a manner other than in accordance with the terms of their original contract.'"  *Richardson v. Allstate Texas Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.-Dallas 2007, no pet.) (quoting *Avary v. Bank of Am., N.A.,* 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied)).  "The defense involves a new contract, either express or implied, in which the existing obligation is released by agreement of the parties through 'means of [a] lesser payment tendered and accepted.'"  *Id.* (quoting *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969)).  "Evidence offered in support of the defense must demonstrate '*both parties agreed* the amount paid by the debtor to the creditor fully satisfied the entire claim.'"  *Id.* (emphasis in original) (quoting *Avary*, 72 S.W.3d at 788).  The evidence is compelling that both parties intended the advance of $119,000

to buy 90,151 shares fully satisfied Western Wind's obligation.  Salama proposed it on Oct. 28, 2011 without reservation or qualification.  (Doc. No. 1-1 at 7.)  Steele agreed to it on Nov. 15 without reservation or qualification and reiterated Western Wind's satisfaction with the plan on Nov. 28.  (Doc. No. 21-10 at 1; Doc. No. 22-2 at 2.)  And Salama, after being carbon copied on a string of e-mails between his attorneys and Steele in which Steele explained Salama's proposal — and stated that his options had expired — replied only to say that any "confusion" on the part of his lawyers as to whether Western Wind had satisfied its obligations to compensate him "came from the fact that I was not informed that this solution is a go."  He then reiterated his understanding of just how it would work.  (Doc. No. 22-2 at 1.)  In short, there is quite a lot of evidence in the record that Salama intended for the cash-for-options proposal to fully satisfy Western Wind's obligations under the Settlement Agreement, and none at all, besides his self-serving and conclusory statement in the affidavit attached to his opposition to this motion,[7] suggesting that he believed he had *some other* consideration coming to him.[8]

   With all of that in mind, to sum up: the Court rejects Salama's argument that there was a failure of consideration because "he received something to which he was already entitled." There is no fact question on that issue.  One who receives stock options is never *entitled* to the stock itself; he merely has the opportunity to purchase it.  Further, the conclusion that there was no failure of consideration is bolstered by looking more broadly at the consideration Salama received.  Not only did he receive more than $119,000 in value, to the extent he received

---

[7] Salama explains that "I never stated verbally or in writing that the brief loan of $119,000 was in full satisfaction of all of Western Wind Energy Corp.'s obligations under the Settlement Agreement."  (Doc. No. 21-1 at 4.)

[8] Salama has now sued Western Wind twice: first for his termination and now because of the expiration of his stock options.  Given how comfortable Salama appears to be seeking judicial intervention, it is rather hard to believe that, if he truly felt that he had not received all he was entitled to under the Settlement Agreement, he would not have sued for that as well.  While certainly not dispositive on its own, this intuition is consistent with the Court's conclusion that Salama has not set forth any evidence that he did not believe the $119,000 advance to fully satisfy Western Wind's obligations to him.

something "different" than what the Settlement Agreement called for, it amounted to an accord and satisfaction.

### B.  Whether the Release Covered Salama's Latest Claims

"Contract interpretation is a purely legal issue." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004); *see also Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996) ("Whether a contract is ambiguous is a question of law for the court to decide.").  "Where the contract language is clear and definite, the contract is not ambiguous and the court must apply the plain language as a matter of law." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) (citing *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999)).  "An ambiguity arises only where the agreement is reasonably susceptible to more than one interpretation." *Id.*  Courts determine whether an ambiguity exists "by looking at the contract as a whole in light of the circumstances present when the parties entered the contract." *Friendswood Dev. Co.*, 926 S.W.2d at 282 (citing *National Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).  Thus, where, as here, the Court is asked to construe a contract on a motion for summary judgment, "'only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.'" *Gonzalez*, 394 F.3d at 392 (quoting *Amoco Prod. Co. v. Texas Meridian Res. Exploration, Inc.*, 180 F.3d 664, 669 (5th Cir. 1999)).

A release, like the one agreed to by Salama and Western Wind, "is a contract subject to the rules of contract construction. Accordingly, in order to establish the affirmative defense of release, the party asserting the defense of release is required to prove the elements of a contract.'" *Vanderbilt Mortgage & Fin., Inc. v. Flores*, 692 F.3d 358, 364 (5th Cir. 2012) (quoting *In re J.P.,* 296 S.W.3d 830, 835 (Tex.App.—Fort Worth 2009, no pet.)).  The usual

rules regarding ambiguity, as described above, apply.  *See Matlock v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 925 F. Supp. 468, 472-73 (E.D. Tex. 1996) (citing *National Union Fire Ins. Co.,* 907 S.W.2d at 520; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983)).   "Mere disagreement by the parties as to the meaning of a provision of the release agreement does not create an ambiguity."  *Id.* (citing *REO Indus. v. Natural Gas Pipeline Co.,* 932 F.2d 447, 453 (5th Cir. 1991)).

"[T]o release a claim, the releasing document must 'mention' it."  *Mem'l Med. Ctr. of E. Texas v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997) (quoting *Victoria Bank and Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex. 1991)).   It must be mentioned to ensure that it is "clearly within the subject matter of the release."  *Victoria Bank*, 811 S.W.2d at 938.   But a claim need not be "specifically enumerated" to be "mentioned."  *Keszler,* 943 S.W.3d at 435.   That is, "[i]t is not necessary . . . for the parties to anticipate and identify every potential cause of action relating to the subject matter of the release."  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.-Houston [14[th] Dist.] 2001, pet. denied) (citing *Keck, Mahin & Cate v. National Union Fire Ins. Co.,* 20 S.W.3d 692, 698 (Tex. 2000)); *see also A2D Technologies Inc. v. MJ Sys., Inc.*, 269 F. App'x 537, 542 (5th Cir. 2008) (same).   To hold otherwise would "force[] employers to scour the United States Code and the state statutes and reports to identify every possible cause of action" before they finalized a release agreement.  *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir. 2002) (applying federal common law).   "Such a rule would add needless transaction costs to settlements. Higher transaction costs, in turn, would discourage settlement in close cases by making settlement comparatively less attractive to the expected value of success on the merits."  *Id.*

With these principles in mind, the question is whether there was ambiguity as to whether the Settlement Agreement mentioned Salama's claim regarding stock options.  The Court finds that there was no ambiguity and that Salama's current claim was mentioned.  Looking at the state of affairs when the Settlement Agreement was signed, Salama had been granted the stock options.  He either knew about the Stock Option Plan or he should have known about it, because the Option Agreement he signed made the grant subject to the "terms and conditions set out in the Plan."[9]  (Doc. No. 21-4 at 2.)  As such, he knew or should have known that his shares would expire within a "reasonable period following the Cessation Date."  (Doc. No. 1-1 at 7.)  He also knew or should have known that he was entitled to receive notice within five business days of his termination regarding the length of the Post Cessation Date Exercise Period.  (*Id.*)  And if he did not receive that notice, he knew or should have known that Western Wind had failed to meet one of its obligations to him.

Consequently, the Court has relatively little difficulty determining that Salama waived his right to contest the availability of his stock options when he signed an agreement releasing "any and all claims, demands, demands for arbitration, and causes of action which he has or claims to have, known, or unknown, of whatever nature, which exist as of, or prior to, the date of this Agreement," including all "claims for unpaid compensation, wages, or benefits," and "any other claim arising out of Salama's provision of consulting services to any of the Western Wind released parties."  (Doc. No. 21-8 at 2.)  That is especially so considering that the agreement stated that "[t]he Parties intend this release to be as general as possible, covering every conceivable contingency which might arise in the future in connect with Salama's provision of consulting services to any of the Western Wind Parties or which may have arisen in the past,

---

[9] At the Nov. 15 hearing, Salama's attorney conceded that his client had not consulted the Stock Option Plan, but offered no reason why.  As such, the Court stands by its assertion that he should have known what was contained therein.

whether known or unknown." (*Id.* at 3.)  The claim Salama makes here — that his stock options had not expired — could be characterized as a claim for compensation or as a claim for benefits and it surely amounted to a claim arising out of "Salama's provision of consulting services." Indeed, the options were granted to him as compensation for his provision of consulting services. Salama cannot seriously contend that this claim was not mentioned.

It follows, then, that Salama's argument that the claims at issue in this lawsuit did not yet exist when he signed the Settlement Agreement is also unavailing.  He is right that, per the terms of the Agreement, it covered claims or disputes that arose "from the beginning of time to the date of this Agreement." (*Id.* at 1.)  And he is also correct that his unsuccessful attempt to exercise his options did not take place until after the agreement had been signed.  But Salama takes an unjustifiably narrow view of what his claim was.  Salama knew or should have known that his stock options would expire at some point after his termination, and he knew or should have known that Western Wind was supposed to have notified him of the length of that time period. He certainly could have sought to exercise those options before signing the Agreement, or he could have inquired as to their expiration, or he could have pressed Western Wind for the notice he was entitled to under the Stock Option Plan.  From the face of the Agreement, it seems clear to the Court that the parties sought to dispose of any dispute arising out of anything that had ever happened between them, even if the cause for dispute was "unknown" to one of the parties.  That one party has now discovered one such disagreement does not change the unambiguous meaning of the contract and it does not give rise to an argument that the claim did not yet exist at the time the Settlement Agreement was signed.

**IV. CONCLUSION**

Plaintiff steadfastly contends that he did not intend to sign away any claim he had to vested stock options when he signed the Settlement Agreement.  While that may not have been his specific intent, he did unambiguously disavow any claim, known or not, that arose out of his provision of consulting services to Western Wind.  The claim he makes in this lawsuit is just such a claim.  That he had not yet realized that his options were in jeopardy when he signed the Settlement Agreement does not alter that conclusion.  Thus, for the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**.  The case is dismissed with prejudice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this 19th day of November, 2013.

_____
**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**

20